Syllabus.

READING TR. CO. v. READING I. WORKS.

APPEALS BY PLAINTIFF AND DEFENDANT FROM THE COURT
OF COMMON PLEAS OF BERKS COUNTY.

Argued March 4, 5, 1890—Decided November 10, 1890.
[To be reported.]

(a) A manufacturing corporation, though making large profits, declared
no formal dividends. Its stockholders, however, were annually credited
on its books with sums equal to six per cent of the value of their stock,
as " interest" thereon; and they were allowed to draw out moneys from
time to time which were charged against this interest credit.

(b) Accounts current were rendered annually to the stockholders, exhib-
iting the balances in favor of or against them, and upon the latter bal-
ances interest was charged as upon an indebtedness. During certain
years, resolutions were in force, limiting the amount which stockholders
might draw out to five per cent upon their capital stock:

1. One of the stockholders, who was also a director, having drawn out
annually, for eight years before his death, sums aggregating more than
the annual interest credit of six per cent, and having received without
objection annual statements of his account which treated him as a debt-
or for the excess, he must be considered as having assented thereto.

(c) The corporation, making returns to the United States for the assess-
ment of income tax in the names of the individual stockholders, reported
their respective proportions of the profits earned by the company, paid
the tax in their names, and charged the same to them, respectively, in
the accounts kept with them:

2. Although the profits earned, and so returned, greatly exceeded the an-
nual interest credits, this action of the company was not the equivalent
of an actual division of profits, so as to cancel the debt of the stock-
holder for his overdrafts, inasmuch as the excess of profits remained in-
vested in the business and was never credited.

3. Such debt of the stockholder to the corporation was made a lien upon
his stock by a by-law which provided that no stock should be transferred
so long as the holder thereof should be indebted to the company, with-
out the consent of the board of directors, and the statute of limitations
did not operate to destroy such lien.

(d) The corporation was reorganized and re-chartered, after the death of
a stockholder, thus indebted at his death for overdrafts above his annual
interest credits. The resolution under which the reorganization took
place, and which was unanimously agreed to, provided that the stock of
the new corporation should be issued proportionately to the holders of
that in the old:

Statement of Facts.

4. Additional provisions in the resolution, that no stockholder indebted to the corporation should receive such new stock till his debt was fully paid, and, on his failure to pay it for sixty days, the directors should apply a sufficient amount of the stock at par to the extinguishment of the debt, and issue the balance to him, were reasonable and within the power of the corporation.

5. Wherefore, the representatives of such deceased stockholder were entitled to recover new stock only to the extent of the value of the old stock held by him, less the amount of his debt at the date of the distribution; but payments on account of profits, made after his death through his executor to the widow, as legatee for life of the income of his estate, were not a valid charge on the stock.

6. When a corporation, in the distribution of a new issue of stock among its members, refuses to issue to a stockholder the amount to which he is entitled, he may recover as damages for such refusal the highest market price the stock afterwards attained, notwithstanding that, pending the suit, the corporation became insolvent and made an assignment for the benefit of creditors.

Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 278, 281 January Term 1890, Sup. Ct.; court below, No. 409 Equity D. 1886, C. P.

In October, 1886, the Reading Fire Insurance and Trust Company, trustee under the will of Charles H. Hunter, deceased, and Emily E. Hunter and others, beneficiaries under said will, filed a bill in equity against the Reading Iron Works, praying for a decree that the defendant corporation issue to the plaintiff trustee 175 shares of the defendant's capital stock, or pay the plaintiffs the value thereof, and damages for failure to make such issue. After answer, the cause was referred to *Mr. C. H. Ruhl* as examiner and master, by whom the following facts were found:

By the special act of April 7, 1862, P. L. 294, the firm of Seyfert, McManus & Co. was erected into a corporation bearing the same name. The capital stock of said corporation was fixed at 284 shares, of the par value of $1,000 each. The plaintiff's testator, Charles H. Hunter, held eight shares of said stock and was a member of the board of directors. At a meeting of the stockholders held on September 1, 1862, at which Charles. H. Hunter was present, by-laws were adopted with his co-operation, one of which, after regulating the manner in which

Statement of Facts.

stockholders might make transfers of their stock, provided further, "that, in addition to the requirements of the third section of the act of incorporation in relation to the transfer of stock, no certificate shall be transferred so long as the holder thereof shall be indebted to the company, unless the board of directors consent thereto."

No formal declaration of dividends was ever made by the directors of Seyfert, McManus & Co., although from 1862 to 1870 large profits were made by the corporation. In connection with the assessment and payment of the United States income tax, the company was in the custom of making statements showing the net annual profits and the proportion thereof belonging to each stockholder, upon which statements the assessor would assess a separate tax against each stockholder, and the company would pay the taxes in the names of the stockholders and charge the same up against them. This was done in pursuance of a resolution of the directors, adopted August 7, 1865, one of the movers of which was C. H. Hunter. The greater part of the profits thus taxed were not in existence as cash, but were invested from time to time, as earned, in extending the business and enlarging the plant of the corporation, and no actual division of them among the stockholders was made.

From 1864 to the time of his death, Hunter and the other stockholders were credited annually upon the books of the company with sums equal to six per cent on their stock at the valuation of $2,500 per share, the credits as entered being stated to be for "one year's interest on stock." These credits were continued annually, after Hunter's decease, until June 30, 1875. From time to time the stockholders drew out moneys on account of their shares of the profits. An account showing the sums so withdrawn, was kept with each stockholder on the books of the corporation.

At a meeting of the board of directors on August 5, 1867, at which Charles H. Hunter was present, the following resolution was adopted: " Resolved, That the stockholders shall not draw out during the current year over 5 per cent on their capital stock (basing it upon $2,500 per share), exclusive of their salaries, excepting Mr. McCarty, who shall be allowed to draw out to the amount of 10 per cent over and above his salary."

On August 9, 1869, the directors, including Charles H. Hunter, adopted a resolution providing that " the company will, during the current year, allow the stockholders to draw out five per cent on their capital stock, in such amounts as they may need, and is convenient for the company to pay."

During the years covered by these resolutions, C. H. Hunter drew out more than 5 per cent upon his shares of stock.   In each year, from 1864 down to the time of his death, he overdrew the $1,200, which was annually credited to him as interest on stock.   The amounts so overdrawn were charged up as due from him to the company in the annual balancing of its account with him, and statements of the account were rendered to him annually, to which he never made objection.   In these statements he was charged with interest upon the balances appearing against him.   At the time of his death in 1870, the books of the company exhibited against him an indebtedness to it of $9,930.84.   The part of the corporate profits returned to the United States tax officers, and taxed in Hunter's name, would, if credited to him, have extinguished his indebtedness and left a balance in his favor.

The will of Mr. Hunter, which was duly proved on June 10, 1870, bequeathed to his wife all his household furniture, and all the residue of his estate to his executor, John McManus, in trust to devote the income thereof to the support and maintenance of the testator's wife and children ; each of said children upon arriving at the age of twenty-five years to receive an equal share of two thirds of the corpus of the trust fund, his wife to receive the income of the remaining one third after the arrival of the youngest child at the age of twenty-five years, and at her death the principal thereof to be divided among said children.

John McManus, the executor of the will, was the president of Seyfert, McManus & Co.   With his consent the company made payments to the widow, on account of income, from 1870 to 1875, aggregating $5,665.50.   McManus settled an account as executor, in 1875, in which he charged himself with these several sums and took credit for their payment to the widow. His account was duly confirmed.   From 1872 to 1876, the resolution of the directors limiting the amount of money to be drawn out by stockholders to five per cent upon their stock

was in force. McManus died in 1875, and the Reading etc.
Trust Company, was duly appointed in his place, as trustee
under Hunter's will.

In 1881, the company was reorganized with the name of the
Reading Iron Works, under the act of April 29, 1874, P. L.
73, with a capital stock of $500,000, divided into shares of the
par value of $100 each. The resolutions under which the re-
organization took place, provided, inter alia, as follows:

"Resolved, That the said five hundred thousand dollars of
stock shall be issued to the stockholders of the present stock
of the Reading Iron Works, in the proportion in which they
now hold their stock; Provided, however, That no stockholder
who is indebted to the corporation shall receive such new issue
of stock until his debt is fully paid. But stockholders who
will be entitled to receive stock at par in excess of their in-
debtedness shall be allowed to surrender shares at par in pay-
ment of such indebtedness.

"Resolved, That in all cases where the debt of a stockholder
to the corporation remains unpaid for a period of sixty days
from the date of letters patent from the governor, the board of
directors is hereby directed to apply so much of the stock at
par as will extinguish the debt, and issue any balance of stock
to him, his heirs, executors, or administrators."

The stock of the new company was to be issued for stock of
Seyfert, McManus & Co., on the basis of one share of the lat-
ter being equivalent to $1,760.56334, which made the full val-
ue of the eight shares held by the plaintiffs equal in value to
$14,084.51. Fifty-six shares of the stock of Seyfert, McManus
& Co. were held by the corporation, whose face value, upon
this basis, was equal to $93,591.52; and, as the plaintiffs were
entitled to $\frac{8}{23}$ of said sum, or $3,459.34, the whole interest of the
plaintiffs was $17,543.85, equal to 175 shares+$43.85, in the
new corporation.

The defendant, however, claimed to charge against that sum
the balance which was standing on its books against C. H.
Hunter at the time of his death, with an increase thereof aris-
ing from the payments afterwards made to the widow, and to
deduct the whole amount thereof, with interest, as an indebted-
ness of Hunter's estate to the company, issuing stock in the
new corporation only to the extent of the value of the plaint-
iffs' old stock after making such deduction.

Master's Report.

Upon the facts found by him, the master reported his conclusions of law in part as follows:

The master having already found the fact that Charles H. Hunter was the owner of eight shares of the old stock, at the time of his death, and that the trust estate represented by the plaintiffs was the owner of the same, at the time of the new distribution of the stock on January 1, 1882, it remains to determine the following, viz.:

1. Was Charles H. Hunter indebted to the defendant at the time of his death, and was such indebtedness increased by his estate after his death; and, in either or both cases, what was the amount of such indebtedness at the time of the new distribution on January 1, 1882?

2. If such indebtedness existed, was it competent for the defendant to appropriate part of the stock to which plaintiffs were entitled by the new distribution on January 1, 1882, in payment of such indebtedness?

These are mixed questions of law and fact. . . . .

It is contended by the learned solicitors for the plaintiffs that the payments made to Charles H. Hunter by the defendant, exceeding five per cent of his share of the profits, cannot now be construed as an indebtedness to the corporation, for the reason that during the time they were made, his share of the profits exceeded the sum total of such payments; and that there is no evidence to show that an indebtedness was then intended to be created, or that it was in the contemplation of the parties. . . . .

—After referring to the resolutions limiting the amount which stockholders might draw out of the company, the master continued:

It is undoubted law that the profits of a corporation must be divided evenly among its stockholders, in proportion to the number of shares held by each: Morawetz on Corp., § 324.   I fail to see, however, in these actions of the corporation, any infringement or violation of this rule of law, as no uneven or unequal distribution of the profits was made or attempted, but, on the contrary, an even and equal distribution of profits was made, all being based upon an equal valuation of the shares, to wit, $2,500.

All that the actions of the corporation did were to limit and

restrict the amount which the several stockholders could draw out.   Such proportion of the profits as were not drawn out were invested in the business of the company, whereby the value of the plant was increased and the market value of the stock correspondingly.   It would be manifestly inequitable and unjust to permit a stockholder to draw out 100 per cent of his share of the profits, and upon a reorganization of the company, to permit him to share equally in the distribution of stock with other stockholders who had drawn out but five per cent of their share of the profits, when the distribution of the new stock is made upon the basis of the increased value of the plant at that time, such increased value being the fruits of the investment therein of the profits of the other stockholders, without requiring the withdrawing stockholders to return to the corporation the excess of five per cent of profits withdrawn, either in cash or its equivalent in stock.

The argument that there is no evidence that Hunter received any portion of these moneys under a contract, express or implied, that they were to be repaid, and that consequently the transactions cannot be regarded as a loan, is fallacious.   Mr. Hunter was bound in good conscience and equity to know that the several sums he drew out were largely in excess of the portion of his share of the profits which were payable to him in cash as regulated by the company ; and the master finds that such excess was received under the implied promise that he would refund it whenever required so to do by the company, and that his shares of stock should stand pledged as security therefor. This view is emphasized by the fact that Mr. Hunter participated in the action of the board of directors already stated, limiting the withdrawal of profits to five per cent.   The well-known maxim that he who seeks equity must do equity, applies here with much potency.

The authority of the corporation to bind the stockholders by the action referred to is questioned, and its right to refuse to transfer or issue shares of stock in the reorganized corporation, to the full face-value of his holdings in the old, is denied by the plaintiffs. . . . .

Whilst the charter does not in express terms give the company a lien on the stock of Mr. Hunter for the debt as found by the master, it provides, as we have seen, " that the stock

Master's Report.

shall be assignable and transferable only on the books of the company, on notice given to the board of directors, and according to the rules and regulations of the by-laws of the company." The power of the stockholders to adopt the by-laws referred to, prohibiting a stockholder in any way indebted to the company from assigning and transferring his stock, except by permission of the directors, cannot be questioned. They had the power without express authority in the charter: Child v. Hudson's Bay Co., 2 P. Wms. 207.

Mr. Hunter was present and assisted at the adoption of the by-laws; therefore, he was bound. "By-laws bind, because the members of the corporation either individually, or by those who represent them, are supposed to give their assent to them." "A course of dealing, a usage, an understanding, a contract expressed or implied, is the lien of parties and a law to them provided they are not repugnant to the charter or the laws of the land:" Per DUNCAN, J., in Waln v. Bank of North America, 8 S. & R. 88.

The act of incorporation authorized and empowered the stockholders to pass the by-laws; it has the same force and binding effect upon them as if it were a provision contained in the act itself. Its effect upon the stockholders, therefore, is defined by the principles decided in Rogers v. Huntingdon Bank, 12 S. & R. 77; Grant v. Mechanics' Bank, 15 S. & R. 140; Sewall v. Lancaster Bank, 17 S. & R. 285, and kindred cases. Under these decisions, it is manifest that the company, by virtue of the provisions contained in the said fourth by-law, had a lien upon the stock of Chas. H. Hunter for his indebtedness, and had a right to refuse a transfer of his stock so long as his indebtedness remained unpaid. The statute of limitations could not then, nor can it now be pleaded in bar of such indebtedness: Spears v. Hartly, 3 Esp. 81; Addison on Cont., 1175; Geyer v. Insurance Co., 3 Pittsb. 41.

When the defendant company was organized, a stockholders' meeting was held on October 5, 1881, and it was then resolved that the $500,000 of stock should be issued to stockholders of the old company in the proportion in which they held their stock in said old corporation; and, also, that no stockholder indebted to the company should receive new stock until his debt was fully paid; and that such debt might be paid by sur-

Master's Report.

rendering new stock at par, and upon failure of any stockholder indebted to the company to pay his indebtedness for a period of sixty days, the board of directors should apply sufficient shares of new stock at par, to extinguish the indebtedness, and issue any balance of stock to the stockholder, his heirs, executors, or administrators. This action was not repugnant to the charter, or the law of the land, and was therefore binding upon the stockholders.

It remains, therefore, to determine the amount of the indebtedness of the plaintiffs to the defendant company at that time. . . . .

—The master then found that the indebtedness of Charles H. Hunter, at the time of his death, was $9,930.84. Referring to the payments made to his widow, after his death, which, the master found, aggregated $5,665.50, the report continued:

It is sought by the company to charge the account with these payments, and deduct this aggregate sum, also, from the shares of stock in the new company to which the plaintiffs were entitled at the reorganization of it in October, 1881. This is resisted by the plaintiffs, who contend that it was the duty of the company to apply the profits to the indebtedness of Mr. Hunter existing at the time of his death; and that the payments to the widow were voluntary, she being entitled under the will of her husband only to the net income of the estate. . . . .

The master has no hesitation in finding that the payments to the widow cannot in any way affect the rights of the parties to this bill. As between the widow and the company, if it were necessary to a decision of this case, the master would hold that they were mere voluntary over-payments, which created no indebtedness as to her, or liability to repay, and this upon the authority of Kennedy v. Hughey, 3 W. 265; Natcher v. Natcher, 47 Pa. 496; Edgar v. Shields, 1 Gr. 361, and Montgomery's App., 92 Pa. 206. . . . .

Whilst it is true that the executor had power under the will to convert the stock into money for the purpose of reinvestment, he had no right or authority to borrow money on the security of the stock, and thus increase the indebtedness of the estate for the purpose of paying it to the life-tenant. The defendant was bound to know that the executor had no such power; it therefore became a mere voluntary payment, which

Master's Report.

cannot now he collected from the remainder-men, who were entitled to the corpus intact. The account of John McManus and its confirmation by the court does not validate the transaction as a borrowing from the defendant.

The master finds that Charles H. Hunter was indebted to the defendant at the time of his decease in the sum of $9,930.84. This includes interest calculated upon the debit and credit side of the account from December 31, 1876. After his death, the credits shown by the books of the company which should have been applied to this indebtedness, amount to $6,000, which, with interest from December 31, 1876, amounts to $7,261, leaving a balance due the company on said December 31, 1876, of $2,669.84, to which add interest to January 1, 1882, $800.95, making the total indebtedness $3,460.79. This sum, to wit, $3,460.79, was a lien upon the stock to which plaintiff was entitled at the reorganization of the company in 1881. The number of shares to which the plaintiffs were entitled as found by the master is 175+$43.85. The number to be applied by the directors to the indebtedness is found to be 34+$60.39, leaving the number of shares of plaintiffs' stock in the new company 140+$83.06.

—The master thereupon recommended a decree that the defendant issue to the Reading etc., Company, trustee, one hundred and forty shares of the defendant's capital stock, at a par value of $100 each, or pay the plaintiffs the value thereof, in exchange for their shares of its old stock, and pay also to the plaintiffs the sum of $83.06, with interest from January 1, 1882, and the costs of this proceeding.

Exceptions to the master's report were dismissed, and the report confirmed, on November 25, 1889, in an opinion by ERMENTROUT, J. Thereupon, the plaintiffs presented a petition, setting forth that the stock of the defendant corporation was of substantial value on January 1, 1882, the date at which the same ought to have been issued to the plaintiffs, and for some years thereafter it increased in value; but that, since the filing of the master's report, the defendant company had made an assignment for the benefit of creditors,* and said stock had

---

*At some stage of the proceedings, the Reading Trust Company, assignee for the benefit of creditors of the Reading Iron Works, was

Master's Report.

become valueless. The court thereupon made an order refer-
ring this petition to the master, who reported on January 14,
1890, finding that the defendant made an assignment for the
benefit of creditors on March 28, 1889, and that the highest
price realized by sales of its stock subsequent to January 1,
1882, was $46.69 per share, which price was obtained for cer-
tain stock sold in January, 1886; and stating his conclusions
of law upon these facts as follows:

The plaintiffs contend that the defendant corporation having
refused to issue the number of shares of stock to which the
plaintiffs were entitled, and having distributed the same to
other shareholders, the defendant became a trustee for the
plaintiffs for the shares due, and must now respond in damages
to the extent of the value thereof.

The defendant contends that the plaintiffs cannot have dam-
ages, but stock only, and bases its contention upon the familiar
principle of law that the stock of a corporation is a trust fund
for the benefit of its creditors, and that the plaintiffs are in no
sense creditors. To adopt this view would be to permit the
defendant company to appropriate the fruit and give the
plaintiffs the husks. The master decides that when the de-
fendant company refused to issue to the plaintiffs the number
of shares to which the plaintiffs were entitled, it became a
trustee for the plaintiffs for the same and must account for the
value thereof, which value must be determined by the highest
selling price of the same from the time of such refusal to the
time of trial.

—In support of this ruling the master cited: Bank of Mont-
gomery v. Reese, 26 Pa. 143; Reitenbaugh v. Ludwick, 31 Pa.
132; Conyngham's App., 57 Pa. 474. He then assessed dam-
ages on the basis of the value of $46.69 per share, with interest
thereon for four years, recommending a decree against the de-
fendant for the sum of $8,208.37 and costs. On January 27,
1890, the court, ENDLICH, J., overruling exceptions to the
master's supplemental report, entered the decree recommended
by him.

Thereupon the plaintiffs took the appeal to No. 281 specify-

brought upon the record, by amendment, as a defendant. The paper-
books did not disclose when this was done.

ing that the court erred in dismissing exceptions filed by the plaintiffs to the following findings of the master:

1. That C. H. Hunter was indebted to the defendant at the time of his decease.

3. That the defendant had a lien upon C. H. Hunter's stock for the moneys drawn by him out of the corporate funds.

4. That the right of the defendant to set up such indebtedness was not barred by the statute of limitations.

8. That the plaintiffs were not entitled to the decree prayed for in their bill.

The defendant had taken the appeal to No. 278, specifying, inter alia, that the court erred:

3. In not allowing the defendant credit for the payments made by it to the widow of C. H. Hunter.

8. In making the decree for the payment of $8,208.37 and costs.

*Mr. Cyrus G. Derr* (with him *Mr. Isaac Hiester*), for the plaintiffs, appellants in No. 281:

1. The Reading Iron Works is attempting to recover back, by way of set-off, from Hunter's estate, all moneys which were voluntarily paid by the corporation during a course of years, in the way of dividends.   The attempt is based upon the fact that the directors never by formal resolution declared a dividend. But it was the usage of the company from the beginning to divide the profits on its books, and permit the stockholders to draw upon the corporate funds on account of their respective shares of such profits.   We contend that profits ·distributed by such method cannot be converted into an indebtedness and recovered back.   No charter provision, statute, nor by-law made that usage unlawful, or required that dividends be declared by formal resolution.   The method pursued was the equivalent of making dividends: Commonwealth v. Railway Co., 74 Pa. 83. The profits thus divided did not always exist in cash for immediate and actual distribution at the end of the year, but it was unnecessary that they should, if they fairly appeared on the balance sheet: Stringer's Case, L. R. 4 Ch. D. 475; Angell & Ames on Corp., § 557, note.

2. The deceased having drawn out, during a series of years, some thousands of dollars as profits, doubtless regulating the

Arguments.

amount of his living expenses on the theory that such sums were income, the corporation cannot be permitted, by treating them as money borrowed, to destroy so much of the corpus of his estate : Montgomery's App., 92 Pa. 206. And, by the course pursued in regard to the assessment and payment of income tax, the corporation is estopped from denying the stockholder's title to the profits received by him. Returns of the share of each stockholder in the profits of the company were made on his behalf in his name. The tax was then paid for him and receipted for in his name ; the receipt taken was handed over to him, and he was charged with the amount so paid. By dividing the income of the corporation into a number of small incomes, the rate of taxation was reduced and the stockholders benefited. Either the method adopted was a bona fide division of profits, or it was a fraud on the government. In either case, it was valid between the parties.

3. The resolutions of the directors limiting the percentage of profits which stockholders might draw out in certain years, must be construed as meaning a percentage exclusive of the six per cent interest on their investment, which was regularly credited to them on the books during these same years. That this was the meaning, is manifest from the whole course of dealing. Even if it were not so, such resolutions cannot be regarded as declarations of dividends. They were not an even division of profits, which dividends must be : Morawetz on Corp., § 324 ; but certain stockholders were permitted to draw out only five per cent and others ten per cent. The resolutions must be regarded simply as fixing the time of payment of each member's share of the profits ; and, when any one drew in excess of the prescribed amount, without objection from the corporation, thus anticipating the prescribed time of payment, he was under no obligation to return any part of what he thus drew.

4. It is an established principle that the law raises no implied promise which will support an action, from the mere fact that one man's money has got into the hands of another : 2 Addison on Cont., *40. Much less will such promise be implied when the money belongs, as in this case, to the person receiving it. We have nothing to do here with the other stockholders, or with the question whether they drew out more or less than Hunter. In neither event, can the sums paid to stockholders

on account of profits, be converted into moneys lent, and the transaction made a basis for the extinguishment of the stock. The items in the account which the master has allowed to be set off against the plaintiffs' claim for stock, all bear date more than six years prior to the time of the issue of the stock, and would therefore be barred by the statute of limitations, and incapable of use as a set-off. If there was an over-payment here, the principle of law which forbids the recovery back of a voluntary payment can never be more equitably applied than in this case.

*Mr. Jefferson Snyder* (with him *Mr. George F. Baer*), for the defendant, appellee in No. 281, and appellant in No. 278:

1. We are not seeking to recover back anything from Hunter's estate. The plaintiffs demanded that their stock in the old corporation be exchanged for stock in the new. As the old stock had become very valuable, partly because the earnings of the corporation had remained with the company and had been used in improving and extending the plant, and, as the several stockholders had never received their exact proportions of any dividends earned, but had drawn out various amounts, charged against them in accounts annually rendered to them and approved by them, the interest which each stockholder had in the assets and franchises of the corporation was not represented alone by his certificates of stock, but by his stock as modified by his private account; and, therefore, to ascertain how much of the new stock he was entitled to, the account must first be adjusted. The process of changing the corporation and issuing new stock, was in substance a dissolution of the old company and a distribution of its assets. In view of the facts, the demand of the plaintiffs is unconscionable.

2. There is no evidence that Hunter ever objected to the accounts so carefully kept and annually rendered to him. The book-keepers being but servants of the corporation, and Hunter being one of the directors, it is substantially correct to say that these accounts were made up by himself. It was with his full knowledge and assent that he stood upon the company's books as its debtor at the time of his death. We are merely insisting that his relations to the company be adjusted on the lines laid down by himself. But the master committed grievous error, in

his treatment of the payments made to Mrs. Hunter after her husband's death. He treated them as if made by the Reading Iron Works, overlooking the fact that it was the executor who in reality received the money from the corporation and paid it over to Mrs. Hunter. The confirmation of the executor's account clearly established this, and also that the payment of this money to her was a proper thing to do. The present plaintiffs are no longer at liberty to dispute those propositions. And it is idle to inquire whether McManus could have borrowed the money on the credit of the estate. He simply drew $5,665.50 of the $6,000 which was set aside as the equivalent of dividends. That sum could have been appropriated by the company to Hunter's indebtedness, but this was not done.

3. The plaintiffs are not entitled to a decree against the defendants for money. It is admitted that the Reading Iron Works has made an assignment and is insolvent. The attempt of the plaintiffs is to secure a part of the assets of the insolvent corporation, instead of stock. If we are correct in our position that the plaintiffs are entitled only to so much stock as represents the value of Hunter's interest after his indebtedness is paid, the company was not in default in refusing to issue the number of shares demanded by the plaintiffs, and should not be made to pay damages. But, in the circumstances of this case, it makes very little difference whether the decree is for money or for certificates of stock, provided it does not entitle them to a share of the fund in the hands of the assignee. The capital stock of a corporation is a trust fund for the benefit of its creditors: Messersmith v. Sav. Bank, 96 Pa. 440. It is difficult to see why the block belonging to the plaintiffs must not be a portion of such fund. As the debts of the company were contracted on the credit of the entire capital stock, without regard to who held it, the plaintiffs ought not to be allowed, because they failed to get a certificate long ago, to appropriate a place in the rank of creditors and take a portion of the fund as an equivalent for the stock.

*Mr. Isaac Hiester* (with him *Mr. Cyrus G. Derr*), for the plaintiffs, appellees in No. 278:

1. We are not concerned with the question whether the pay-

Arguments.

ments to the widow were proper.  Admit them to be so, and that very admission demonstrates that they were payments of income.  We contend that having been made as such, they cannot now be charged against the corpus.  If they were an "increase of indebtedness," they were illegal and must be disregarded; if they were payments of income, we have nothing to do with them and they must be disregarded.  In neither case do they affect the indebtedness which the master and the court have found was due from Hunter at his death.

2. The defendant now abandons the averment of an increase of indebtedness, and argues its case on the basis that the payments to the widow were payments of income credited after Hunter's death.  If they were part of the profits of the company accumulated during his life, the payment was wrong, because such accumulations were part of the principal of his estate: Earp's App., 28 Pa. 368.  If, on the other hand, they were earnings accruing subsequent to his death, he had anticipated these dividends, as the moneys drawn by him during his life were admittedly received by him on account of his share of profits, and the company cannot have credit for a second payment of them.  Nor can the widow appropriate principal to make up to her a deficiency of income arising from such anticipation : Blackstone v. Blackstone, 3 W. 335.

3. As to the form of the decree, little need be said.  As the corporation is insolvent and the stock cannot be issued so as to be of any value to the plaintiffs, they are entitled to damages in lieu thereof: Masson's App., 70 Pa. 26; Mayer's App., 73 Pa. 166; Fessler's App., 75 Pa. 483; Allison's App., 77 Pa. 221.  Ordinarily the measure of damages would be the market value of the stock on the day it should have been delivered: Huntingdon etc. R. Co. v. English, 86 Pa. 247; North v. Phillips, 89 Pa. 250; but, when the defendant occupies the position of a trustee for the plaintiff, as is the case here, the rule is different, and the measure is the highest market price reached up to the time of trial: Reitenbaugh v. Ludwick, 31 Pa. 132; Conyngham's App., 57 Pa. 474; Bank of Montgomery v. Reese, 26 Pa. 143.  We have not asked a place in the rank of creditors, but have been assigned a place there by the default of the corporation.

NO. 281.

OPINION, MR. JUSTICE McCOLLUM:

The first and controlling question to be considered in this case is whether Charles H. Hunter, who was a stockholder in a corporation known as Seyfert, McManus & Co., was its debtor at the time of his death in 1870. The master has found that he was, and the court has approved the finding. But this finding is a deduction from undisputed facts, and the appellants claim that it is not authorized by them. These facts are distinctly and fully stated in the master's report, and need not be repeated here. They show a course of dealing between the corporation and its stockholders, by which the latter received upon the books of the former an annual credit of six per cent on the agreed value of their shares, and were charged with the amounts drawn out "on their capital stock." An account current containing all the items of debit and credit was kept with and annually furnished to each stockholder, and he was thus advised of the state of his account with the corporation, and, if the debits exceeded the credits, that he appeared on the books of the latter as its debtor to the amount of the excess. The account included the balance of the previous year, together with interest upon it and the sums drawn out. This interest was applied in reduction of the interest credit to which the stockholder was entitled, as appears by the entry "by balance of interest account per account current rendered." A stockholder who, annually for eight years, received a statement of his account without intimating that it was incorrect in form or fact, must be considered as consenting to its accuracy. But independent of the notice afforded by the account current, Hunter must have known that he appeared on the books of the corporation as its debtor, because he was one of its directors, actively participated in the management of its affairs, and was present when the resolutions were adopted, which limited the amount that the stockholders might draw out to five per cent on their capital stock.

Previous to and for several years after the death of Hunter the corporation made large profits, but declared no dividends. These profits were "invested in the business in various properties," thereby increasing the capacity of the plant and the value of the stock. In 1865, on motion of Hunter, it was resolved

" that the report of the assessor of income tax of the profits of last year be made in the individual names of the stockholders, and their respective amounts charged to their account when paid to the collector ; " and the reports and charges were thereafter made in accordance with this resolution.   The appellants insist that this action was the equivalent of an actual division of the profits.   But this claim is sufficiently answered by the fact that the profits remained in the business and were not credited in the account current, while the taxes were charged therein.   We think the master was justified in finding that Hunter was indebted to the corporation in the sums drawn out by him in excess of the credit of six per cent on the agreed value of his stock.

This indebtedness was a lien on his stock by virtue of the by-laws he assisted in making.  The stock was pledged for its payment: Waln v. Bank of North America, 8 S. & R. 73 ; Rogers v. Huntingdon Bank, 12 S. & R. 77 ; Grant v. Mechanics' Bank, 15 S. & R. 140 ; Sewall v. Lancaster Bank, 17 S. & R. 285.   When the corporation was reorganized under the name of the Reading Iron Works, with a capital stock of $500,000 divided into shares of the par value of $100 each, it was

" Resolved, That the said five hundred thousand dollars of stock shall be issued to the stockholders of the present stock of the Reading Iron Works, in the proportion in which they now hold their stock: Provided, however, that no stockholder who is indebted to the corporation shall receive such new issue of stock until his debt is fully paid.   But stockholders who will be entitled to receive such stock at par in excess of their indebtedness shall be allowed to surrender shares at par in payment of such indebtedness.

" Resolved, That in all cases where the debt of a stockholder to the corporation remains unpaid for a period of sixty days from the date of letters-patent from the governor, the board of directors is hereby directed to apply so much of the stock at par as will extinguish the debt, and issue any balance of stock to him, his heirs, executors, or administrators."

This action was reasonable and within the power of the corporation.   It was unanimously agreed to at a meeting of the stockholders, duly convened, and its legality is not questioned

by the appellants.  The statute of limitations does not destroy the lien which the corporation has upon the stock.  The pledge cannot be recovered without payment of the debt secured by it.

Decree affirmed, and appeal dismissed at the cost of the appellants.

## NO. 278.

OPINION, Mr. JUSTICE McCOLLUM:

Two questions are raised by this appeal.  The first is, whether the sums paid by the corporation to the widow of Charles H. Hunter constitute an indebtedness of his estate ; and second, whether under the circumstances of the case a decree for the payment of money is allowable.  Hunter, by his will, devised the residue of his estate, after the payment of his just debts, to his executor, in trust to devote the net income thereof to the maintenance of his wife and children for a period therein named, and as each child attained the age of twenty-five years to pay to him his proportion of two thirds of the principal, and at the death of the widow his proportion of the remaining one third of it.  No authority was given to the executor to pledge any portion of the assets of the estate for a loan to be expended in their maintenance.  The sums paid to the widow from 1870 to 1875 were charged in the account opened with Hunter in 1862, and the effort of the appellant is to subject the stock belonging to Hunter's estate to a lien for them.

At the time of his death, in 1870, Hunter was indebted to the corporation, and his stock was pleged for the payment of this indebtedness.  He was then entitled to an annual credit in his account of six per cent on the agreed value of his stock.  These credits were entered in the account each year after his death until 1876.  The account shows that the corporation actually appropriated a portion of each year's interest credit to the payment of interest on the debt, as it had done in Hunter's lifetime.  The balance of this interest credit was applicable to the items of the debt in the order of their entry.  It is clear that the widow had no authority to bind the estate by a receipt for any portion of its assets, or in any manner to increase its indebtedness.  But it is claimed that the payments were made to her by direction of the executor, who was also president of the corporation, and that they were therefore in effect payments

to him as the legal representative of the estate.    If it be conceded that these payments were made to the executor, it remains to inquire whether he could increase the debt for which the stock was pledged, by drawing out sums in excess of or equal to the interest credits in the account which were applicable to that debt.    The annual balances in the account show that the first year after Hunter's death the debt of his estate was reduced from $7,987.56 to $7,524.21, and that in the second and third years it was increased from $7,524.21 to $10,493.20, by charging to the estate the sums paid to the widow.    If the sums so paid by the direction of the executor became a debt of the estate and a lien upon the stock, it would follow that he might devote the principal of the estate to the maintenance of the widow and children, while the will limited his expenditures in that behalf to the net income thereof, after the payment of its just debts.    The interest credits were not dividends, but payments on an account in which the sums paid to the widow were improperly charged, thus apparently but not actually increasing the debt of the estate.    The powers of the executor under the will were known to the corporation of which he was the chief officer.    We think the learned master was right in holding that the interest credits were applicable to the debt for which the stock was pledged, and that the amounts received by the widow were not a lien on the stock, or a debt of the estate.

On the 28th of March, 1889, the corporation made an assignment for the benefit of its creditors, and at the time of the final decree its stock was worthless.    The assignee was admitted to defend, and it is now claimed that a decree for money is improper, because it may affect injuriously the general creditors. It is conceded that, but for the assignment and insolvency of the corporation, the decree in this respect is unobjectionable, because it was the plain duty of the corporation, under its own resolutions, to issue the stock.    But we are unable to see how these can affect the rights and liabilities of the original parties to this litigation.    The assignee succeeded to the defences of the assignor and is limited to them.

Decree affirmed, and appeal dismissed at the cost of the appellant.