## In re READING HOSIERY CO.

(District Court, E. D. Pennsylvania. June 30, 1909.)

No. 2,878.

1. BANKRUPTCY (§ 314*)—CLAIMS—DETERMINATION—TIME.

The rights of creditors to share in the distribution of a bankrupt's estate are fixed by the status of their claims at the beginning of the proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 470; Dec. Dig. § 314.*]

2. BANKRUPTCY (§ 314*)—CORPORATIONS—PREFERRED STOCK—BONDS—EXCHANGE—ELECTION.

Where a corporation provided a bond issue with which to take up the preferred stock, and the holder of such stock, on being tendered bonds in the place thereof, refused the tender and demanded money, to which he was entitled under the retirement proceedings, after which the bonds so tendered were kept in the corporation safe in an envelope, with the stockholder's name indorsed thereon, for more than a year, until the corporation became bankrupt, the stockholder was bound by his election, and could not then demand the bonds from the trustee in exchange for his stock.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

In Bankruptcy.

Isaac Hiester, for petitioner.

T. Iaeger Snyder, for trustee.

J. B. McPHERSON, District Judge. The facts upon which the question for determination is presented are thus stated in the report of the referee (Samuel E. Bertolet, Esq.):

"On December 15, 1902, the Reading Hosiery Company issued a certificate to Josiah W. Johnson, entitling him to 60 shares of the preferred stock of the company, par value $50, with interest payable annually at 6 per cent. The certificate provides that the preferred stock is subject to redemption at $52.50 on April 1, 1908, or any dividend day thereafter. The by-laws and minutes of the company do not disclose on what other terms, if any, this preferred stock was issued.

"On June 1, 1904, the stockholders of the Reading Hosiery Company held a special meeting for the purpose of voting on a resolution to mortgage the company's property, in an amount sufficient to retire the preferred stock; the stockholders having first waived in writing the required legal notice of such meeting. At this meeting a motion was adopted authorizing the officers to mortgage the property and use the money to retire the preferred stock.

"Nothing seems to have come of this action, for on September 14, 1905, the common stockholders held a special meeting called for this and other purposes, authorizing the directors to direct the officers to execute a mortgage on the company's properties for $150,000 to secure a bond issue of like amount, to sell any part of said bonds, or all except $20,000 worth, which were to be used to pay for property at Pottstown, the first $75,000 arising from the sale of the bonds to be placed in the treasury of the company for the use of the company. as the directors might determine, including the retirement of the then outstanding preferred stock, any further sale of bonds to be applied to retiring said preferred stock, or the officers were to exchange bonds for preferred stock outstanding, or hypothecate bonds, and use the proceeds to retire any or all of said preferred stock, and the officers might enter into an agreement with any or all of the holders of preferred stock to apply the proceeds

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of bonds sold, after the first $95,000 worth had been disposed of, toward the retirement of preferred stock.

"The directors met on the same day, and among other things they directed the officers of the company to apply any part of the first $75,000 resulting from the sale of the proposed bonds, as they might deem proper and expedient, toward the retirement of any of the preferred stock, and also directed them to give the company's note and pledge any of the unsold bonds as collateral to borrow money to retire any outstanding preferred stock.

"After this action had been taken, it was realized that it did not comply with the act of February 9, 1901 (P. L. p. 3), relating to increasing the indebtedness of corporations. The directors accordingly held a meeting on October 25, 1905, and passed a resolution to increase the company's indebtedness $150,000, to place a mortgage on the property of the company, to secure an issue of bonds of like amount, and to call a meeting of the stockholders for December 28th to submit the proposition to them. The stockholders met on December 28th, after notice according to the act, and judges selected by the directors received ballots for or against the increase of indebtedness. The increase was authorized without a dissenting vote. On January 29, 1906, the directors met and authorized the president to deliver for certification 150 bonds, of $1,000 each, to the Colonial Trust Company of New York, trustee for the bondholders. The president and secretary were directed to sign and seal the bonds, and the president was given authority to receive all of them, and to sell, hypothecate, or otherwise dispose of them for the benefit of the Reading Hosiery Company.

"It does not clearly appear how the president disposed of the bonds; but it seems that in accordance with this resolution, and resolutions previously adopted by the stockholders, he exercised the options therein given, and sold some, hypothecated others, and exchanged some with the holders of preferred stock. It is also probable, though it does not appear, that some of the money realized was used to pay off certain preferred stock. Be this as it may, it does appear that some time after January 29, 1906, and prior to July of the same year, he caused three bonds, of $1,000 each, to be taken by Josiah W. Johnson, who held $3,000 worth of preferred stock. The superintendent of the company put them in a wrapper, Johnson's name was written upon it, together with the numbers of the bonds, and the superintendent then took the package to Johnson and offered it to him, saying that these were his bonds, to be given to him in exchange for his preferred stock. Johnson refused to take the bonds, saying that he understood that the preferred stock was to be paid off in cash. The package was then returned to the company's safe, and remained there, unopened, until the company became bankrupt on September 4, 1907. When the trustee was elected, he took possession of the safe, and found the original package containing the bonds. Some time later Johnson learned that the bonds were so found by the trustee and still remained in his possession. When this discovery was made does not appear; but on February 17, 1909, he filed his petition asking that the trustee be directed to turn the bonds over to him, offering at the same time to surrender his certificate of preferred stock."

Upon these facts the referee refused Johnson's petition, and his action is now before the court for review.

It is to be assumed for the purpose of this decision that Johnson had the legal right to insist upon cash for his preferred stock, and that he was not obliged to accept the company's bonds in exchange therefor. The company did not deny his right to demand cash; but they gave him the option of accepting bonds, instead of money. This was the sole purpose of offering the bonds in the spring of 1906; for they took no action that was equivalent, or intended to be equivalent, to delivery, and they did not set apart the bonds, so that in any event and at any time in the future he should be entitled to claim them. They were put in an envelope indorsed with his

name before they were offered to his option, and the envelope with its contents was afterwards placed in the company's safe; but there is no evidence that this indorsement was intended to have any special significance. It was simply a customary memorandum of convenience, to indicate the contents of the envelope, and the bonds were necessarily retained in the company's possession for safe-keeping and also awaiting such further action as Johnson or the company itself might see proper to take in the premises. Undoubtedly the company was at liberty to sell them, for Johnson had distinctly refused to accept the securities, insisting upon his right to cash, and there was no agreement whatever that gave him any interest in their future disposition. So far as appears he maintained this attitude until after the company's bankruptcy, when for the first time he announced that he had changed his mind and was now willing to accept the bonds. I agree with the referee that he had delayed too long. At the time when the company went into bankruptcy, Johnson's claim was either for the value of his stock or for damages resulting from the company's failure to redeem it in cash. He had been offered the option to take bonds, but had refused it, and, of course, he had then no right to ask for the delivery of these securities. It has been argued that if he had chosen to sue for the par value of his stock he might have enjoined the company from disposing of the bonds until the suit should be decided, and therefore that the bonds should now be regarded as subject in equity to his claim. But the answer to the argument is, I think, that in fact he brought no such suit and asked for no such relief. Apparently he was content to wait upon the company's convenience, hoping, perhaps, that they might sell the bonds that he had refused and from their proceeds might pay him in cash the par value of his stock, or at all events expecting that from some source the needful money might be obtained. In other words, he deliberately chose one course of action out of two or three that were open to him, and only attempted to choose another course after the company's bankruptcy had shown that his original choice was unlikely to be profitable. In my opinion the effort cannot succeed. The rights of other creditors have intervened, and the status of his claim against the bankrupt has been fixed by the institution of proceedings in the district court. It has been often decided, in various forms, that the rights of claimants to share in the distribution of a bankrupt estate are fixed by the status of their claims at the beginning of the proceedings. Swarts v. Bank, 117 Fed. 5, 54 C. C. A. 387; Re Bingham (D. C.) 94 Fed. 796; Re Swift, 112 Fed. 316, 50 C. C. A. 264; Re Dreher Shoe Co. (D. C.) 112 Fed. 404; Re Garlington (D. C.) 115 Fed. 999, 8 Am. Bankr. Rep. 602; Re Graff (D. C.) 117 Fed. 343, 8 Am. Bankr. Rep. 750; Re Adams (D. C.) 130 Fed. 381; Re Pettingill (D. C.) 137 Fed. 143; Collier (6th Ed.) 507; Loveland (3d Ed.) 337.

This is not the case of a creditor liquidating a claim after bankruptcy, or proving upon a liability that was originally contingent, but has now become fixed; but it is the wholly different case of a

creditor who by his own choice occupied a definite relation to the bankrupt estate when the proceedings began, but now seeks to abandon such relation and to take up a new position merely because he finds it to be more advantageous. If more advantageous to him, it is nearly certain to be detrimental to other creditors, and I am unable to see upon what ground the change of attitude can be permitted.

Even if the Pennsylvania decisions were controlling upon the subject of his right to change, the cases he cites are in my opinion not in point. In Reading Trust Co. v. Reading Iron Works, 137 Pa. 282, 21 Atl. 169, it appeared that a corporation, being about to distribute new stock among its stockholders, refused to issue certain shares to Charles Hunter, claiming the right to withhold the stock until an account between Hunter and the corporation should be adjusted. Thereupon Hunter filed a bill in equity to compel the issue of the stock, and in that proceeding it was decided that the company's refusal was not justified, and that Hunter was entitled to a money decree for damages notwithstanding the fact that while the suit was pending the company had become insolvent and had made an assignment for the benefit of creditors. In Pennsylvania an assignee for creditors is merely the hand of the assignor for purposes of distribution, and on this ground the decision was sustained on appeal; the Supreme Court saying (page 301 of 137 Pa., and page 170 of 21 Atl.) :

"On the 28th of March, 1899, the corporation made an assignment for the benefit of creditors, and at the time of the final decree its stock was worthless. The assignee was admitted to defend, and it is now claimed that a decree for money is improper, because it may affect injuriously the general creditors. It is conceded that, but for the assignment and insolvency of the corporation, the decree in this respect is unobjectionable, because it was the plain duty of the corporation under its own resolutions to issue the stock. But we are unable to see how these can affect the rights and liabilities of the original parties to this litigation. The assignee succeeded to the defenses of the assignor and is limited to them."

When the controversy came up a second time (Reading Iron Works' Estate, 149 Pa. 182, 24 Atl. 202) the present Chief Justice made the court's position still more clear. He said on page 184 of 149 Pa., and page 204 of 24 Atl.:

"Nor do we think the equities of the other creditors superior to that of the appellant. The wrong done to it was in 1882, long before the insolvency of the company, and before many of the debts to the other creditors were incurred. It is true that the capital stock of a corporation is a trust fund for the security and payment of creditors, and that stockholders as such cannot withdraw or diminish any part of it. But it is liable for the obligations of the corporation, including those growing out of its torts, and equally in this latter respect to stockholders as to others. The appellant had been practically ousted from its position as a stockholder long before the insolvency, and the protracted litigation had postponed its reinstatement until it would have been of no value. As already said, if the right to the stock had been abandoned, and damages claimed for the conversion, there could have been no question of the appellant's position as a creditor, nor would it have been of any avail for the other creditors to set up the diminution of their dividend. This is a disadvantage to them that always happens when another creditor comes in to take part of a fund insufficient to pay those already claiming it. The case is no different when a court of equity having the facts before it determines

the status of an ousted stockholder to be that of a creditor, and grants relief in damages for an act antecedent to the insolvency in the same manner that a court of law would have done if the suit had been for the tortious act in the first instance. When the assignment was made the wrongful act had been committed, and the relief to be given was under consideration by the court of equity, and the assets passed to the assignee for the benefit of creditors, subject to the complainant's claim and the relief the court might give it. When the court determined that such relief should be by compensation in damages, it was doing equity by giving the only relief that would be substantial, and the other creditors had no ground of complaint that a claim as old and as meritorious as their own had been put upon an equality with theirs, although it grew in the first instance out of a wrong done to the complainant as a stock-holder."

Manifestly the present case does not resemble the claim of Hunter for his stock or for damages in lieu thereof. Here there was a positive refusal to accept the securities that Johnson had been offered, and an insistence upon being paid in cash the par value of his stock. No suit was ever brought, and Johnson persisted in his claim for money until the rights of other creditors, as well as of himself, were fixed by the bankruptcy proceedings. It must, of course, be understood that there is no attempt to interfere with any claim that he may have had when the proceedings were begun. The ruling of the court simply is that he cannot be allowed to bring forward now a new claim, materially different in kind, to the prejudice of other creditors' rights.

The order of the referee is affirmed.